UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| J.C., a minor by and through her guardian ad litem R.C., | ) ) ) | CV 08-03824 SVW (CWx) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT; ERIK WARREN, both in his individual capacity and as principal of Beverly Vista School, CHERRYNE LUE-SANG, both in her individual capacity and as assistant principal of Beverly Vista School; and JANICE HART, both in her individual capacity and as an employee of Beverly Vista School, | ) ) ) ) ) ) ) ) ) ) ) | ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AS TO HER FIRST AND SECOND CAUSES OF ACTION FOR VIOLATION OF 42 U.S.C. § 1983, AND GRANTING INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF QUALIFIED IMMUNITY AS TO THE FIRST CAUSE OF ACTION [45][50] |
| Defendants. | ) ) | |

## I.    INTRODUCTION

Plaintiff J.C. brought this action against the Beverly Hills Unified School District, and school administrators Erik Warren, Cherryne Lue-Sang, and Janice Hart ("the individual Defendants"), for the alleged violation of her constitutional rights.  Plaintiff seeks injunctive relief, as well as damages against the individual

defendants, and nominal damages in the amount of $1.00 against the School District.

The parties have brought cross motions for summary adjudication. Plaintiff J.C. seeks summary adjudication as to her First and Second Causes of Action against the individual Defendants and the District for the alleged violation of her First Amendment rights under 42 U.S.C. § 1983. Plaintiff also seeks summary adjudication on her Third Cause of Action for violation of her right of due process, also under section 1983.

The individual Defendants, Warren, Hart, and Lue-Sang, seek summary adjudication as to the First Cause of action for money damages on the grounds of qualified immunity.

For the reasons stated below, the Court GRANTS Plaintiff's motion for summary adjudication as to the First and Second Causes of Action. An order regarding Plaintiff's due process claim, the Third Cause of Action, will follow shortly.

The Court also GRANTS the individual Defendants' motion for summary adjudication. The individual Defendants are entitled to qualified immunity on Plaintiff's First Cause of Action for money damages.

**II.  FACTS**

The following material facts are undisputed. Plaintiff J.C. was a student at Beverly Vista High School ("the School") in May 2008. Individual Defendant Erik Warren ("Warren") is, and at all relevant times was, the principal of the School. Individual Defendants Cherryne Lue-Sang ("Lue Sang") and Janice Hart ("Hart") are, and at all relevant

times, were the administrative principal and counselor at the School, respectively.

On the afternoon of Tuesday, May 27, 2008, after the students had been dismissed from the School for the day, Plaintiff and several other students gathered at a local restaurant. (Plaintiff's Statement of Undisputed Facts in Support of Motion for Summary Adjudication ["PSUF"] 1.) While at the restaurant, Plaintiff recorded a four-minute and thirty-six second video of her friends talking. (PSUF 7.) The video was recorded on Plaintiff's personal video-recording device. (Id.) The video shows Plaintiff's friends talking about a classmate of theirs, C.C. (PSUF 8.) One of Plaintiff's friends, R.S., calls C.C. a "slut," says that C.C. is "spoiled," talks about "boners," and uses profanity during the recording. (Defendants' Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Adjudication ["DSUF"] 7; Declaration of J.C. in Support of Pl.'s Mot. For Summ. Adjudication ["J.C. Supporting Decl."], Exh. 1 [YouTube video].) R.S. also says that C.C. is "the ugliest piece of shit I've ever seen in my whole life." (J.C. Supporting Decl., Exh. 1 [YouTube video].) During the video, J.C. is heard encouraging R.S. to continue to talk about C.C., telling her to "continue with the Carina rant." (DSUF 9.)

In the evening on the same day, Plaintiff posted the video on the website "YouTube" from her home computer. (DSUF 10.) YouTube is a publicly-available website where persons can post video clips for viewing by the general public. While at home that evening, Plaintiff contacted 5 to 10 students from the School and told them to look at the video on YouTube. She also contacted C.C. and informed her of the

video.  (DSUF 11-12.)  C.C. told Plaintiff that she thought the video was mean.  (Declaration of John W. Allen in Opp'n to Pl. Mot. For Summary Judgment ["Allen Opp'n Decl."], Exh. H, [J.C. Depo. at 53:25-54:17].)  Plaintiff asked C.C. whether she would like Plaintiff to take the video off the website, but C.C. asked her to keep the video up. (Id. at 53:25-54:17.)  C.C.'s mother told C.C. to tell Plaintiff to keep the video on the website so that they could present the video to the School the next day.  (DSUF at 17.)

Plaintiff estimates that about 15 people saw the video the night it was posted.  The video itself received 90 "hits" on the evening of May 27, 2008, many from Plaintiff herself.  (DSUF 13-14.)

On May 28, 2008, at the start of the school day, Plaintiff overheard 10 students discussing the video on campus.  (DSUF 15.)  C.C. was very upset about the video and came to the School with her mother on the morning of May 28, 2008 so they could make the School aware of the video.  C.C. spoke with school counselor Hart about the video.  She was crying and told Hart that she did not want to go to class.  (DSUF 18, 20.)  C.C. said she faced "humiliation" and had "hurt feelings." (PSUF 20.)  Hart spent roughly 20-25 minutes counseling C.C. and convincing her to go to class.  (DSUF 22.)  C.C. did return to class, and the record indicates that she likely missed only part of a single class that morning.  (Id.; Declaration of John Allen In Support of Def.'s Mot. For Summary Judgment ["Allen Supporting Decl."], Exh. N [Lue Sang Depo. at 15:4-11] [testifying that she met with C.C. and her mother for, at most, 45 minutes].)

School administrators then investigated the making of the video. Lue-Sang viewed the video while on the school campus.  (Decl. of S.

Martin Keleti in Support of Pl. Mot. ["Keleti Supporting Decl."], Exh. A ["Lue-Sang Depo. at 95:4-7].)  She called Plaintiff to the administrative office to write a statement about the video.  (PSUF 13.)  Lue-Sang and Hart also demanded that Plaintiff delete the video from YouTube, and from her home computer.  (PSUF 17.)  School administrators questioned the other students in the video, including R.S., V.G., and A.B., and asked each of them to make a written statement about the video.  (DSUF 25.)  R.S.'s father came to the School and watched the video with R.S. on campus.  (DSUF 23.)  He then took R.S. home for the rest of the day.  (Id.)

Lue-Sang and Hart also contacted principal Warren regarding the video.  (PSUF 15.)  Warren then contacted Amy Lambert, the Director of Pupil Personnel for the District, regarding whether the School could take disciplinary action against Plaintiff for posting the video on the Internet.  (DSUF 37.)  Lambert discussed the situation with attorneys and advised Warren that Plaintiff could be suspended.  (DSUF 38.)  Plaintiff was suspended from school for two days.  (PSUF 25.)  No disciplinary action was taken against the other students in the video.  (PSUF 27.)

Plaintiff had a prior history of videotaping teachers at the School.  In April 2008, Plaintiff was suspended for secretly videotaping her teachers, and was told not to make further videotapes on campus.  (DSUF 43-44.)  During the investigation about the YouTube video on May 28, 2008, school administrators also discovered another video posted by Plaintiff on YouTube of two friends talking on campus.

(DSUF 41.)  It is unclear when this video was recorded or posted on the Internet, but it clearly was made while J.C. was at School.[1]

Students at the School cannot access YouTube or other social networking websites on the School's computers, as those websites are blocked by means of a filter.  (PSUF 29.)  Certain cell phones can access the Internet, including the YouTube website, and allow the user to view videos.  (DSUF 35.)  However, the School is not aware of how many students have cell phones with that capability.  (PSUF 31.) Students at the School are prohibited from using their cell phones on campus in any manner.  (PSUF 30.)  There is no evidence that any student viewed the YouTube video on his or her cell phone while at School.  The only instances the video was viewed on campus, to the parties' knowledge, were during the school administrator's investigation of the video.

**III. ANALYSIS**

   **A.   Legal Standard**

   Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); <u>Tarin v. County of Los Angeles</u>, 123 F.3d 1259, 1263 (9th Cir. 1997).

   The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  If that party bears the burden

---

[1] These videos are not of the same variety of the YouTube video that is the subject of this lawsuit.

6

of proof at trial, it must affirmatively establish all elements of its legal claim.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885 (9th Cir. 2003) (per curiam).  Otherwise, the moving party may satisfy its Rule 56(c) burden by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  See id. at 323-34; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1968).  A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.  Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000).  Genuine disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  See Anderson, 477 U.S. at 248; see also Aprin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

Finally, the nonmoving party may show that a genuine issue exists for trial if, although the facts are largely undisputed, reasonable minds could differ as to the ultimate conclusions to be drawn from those facts.  Sankovich v. Life Ins. Co. of North America, 638 F. 2d 136, 140 (9th Cir. 1981); 49 C.J.S. JUDGMENTS § 301 (2009) (even where court believes the moving party is more likely to prevail at trial, summary judgment must be denied if a reasonable jury could return a verdict for the nonmoving party).

**B.   Violation of First Amendment Rights**

Plaintiff contends that the School District and the school administrators, Hart, Lue-Sang, and Warren, violated her First Amendment rights by punishing her for making the YouTube video and posting it on the Internet.  Plaintiff argues that the School had no authority to discipline her because her conduct took place entirely outside of school.  To resolve this issue, the Court must first determine the scope of a school's authority to regulate speech by its students that occurs off campus but has an effect on campus.

**1.   The Supreme Court Student Speech Precedents**

In 1969, The Supreme Court held in Tinker v. DesMoines Independent Community School District that a school may regulate a student's speech or expression if such speech causes or is reasonably likely to cause a "material and substantial" disruption to school activities or to the work of the school.  393 U.S. 503 (1969).  In Tinker, two high school students and one junior high school student wore black armbands to school in protest of the Vietnam War.  School officials asked them to remove the armbands, and they refused.  Pursuant to a school policy adopted just days before in anticipation of a protest, the students were suspended until they would return to school without the armbands. Id. at 504.  The lower court upheld the suspension, but the Supreme Court reversed.  Id. at 514.

In an oft-quoted passage, the Court noted: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id. at 506.  The Court found that the students' expression constituted political speech.  Although the issues raised by such speech were

undoubtedly controversial – the propriety of the Vietnam War - the students' conduct was "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [their] part." <u>Id.</u> at 508. The Court held that a student may express his opinions, even on controversial subjects, so long as doing so does not materially and substantially "interfer[e] with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others." <u>Id.</u> at 513. Conversely, school discipline is appropriate where the facts "reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" as a result of the student's speech. <u>Id.</u> at 514.

Applying this test to the facts in <u>Tinker</u>, the Court concluded that no actual disruption occurred and there was no reason to believe that the students' wearing of the armbands would cause a substantial disruption to the school's activities. Thus, the school's disciplinary action violated the students' First Amendment rights. <u>Id.</u>

The Supreme Court decided three cases after <u>Tinker</u> that carved out narrow categories of speech that a school may restrict even without establishing the reasonable threat of substantial disruption. First, in <u>Bethel School District v. Fraser</u>, the Court held that there is no First Amendment protection for lewd, vulgar or "patently offensive" speech that occurs in school. 478 U.S. 675, 681 (1986). In <u>Fraser</u>, a high school student gave a speech nominating a fellow student for elective office at an assembly held during school hours. Nearly 600 students attended the assembly. <u>Id.</u> at 678. The speech was an "elaborate, graphic, and explicit sexual metaphor." <u>Id.</u> The student was suspended for making the speech. The School argued that the speech

violated a school rule which prohibited "conduct that materially and substantially interferes with the educational process, . . . including the use of obscene, profane language or gestures." Id.

The Court upheld the disciplinary action. The Court held that the First Amendment rights "of students in public school are not automatically coextensive with the rights of adults in other settings," and must be applied "in light of the special characteristics of the school environment." Id. at 682, 687-88. The court reasoned that public schools have an affirmative obligation to instill in students the "fundamental values of 'habits and manners of civility' essential to a democratic society" and to teach students "the boundaries of socially appropriate behavior." Id. at 681. Thus, while Matthew Fraser could have given his salacious speech outside of the school and could not have been "penalized simply because government officials considered his language inappropriate," the same is not true of speech occurring within the school. Id. at 688 and n.1 (Blackmun, J. concurring); see id. at 683 (students have "*the classroom right* to wear Tinker's armband, but not Cohen's jacket) (emphasis added). The Court held that where a student engages in lewd, vulgar, or plainly offensive speech at school, the school may regulate such speech as part of its duty to convey to its students "the essential lessons of civil, mature conduct." Id. at 683. Ultimately, the determination of what manner of speech is inappropriate "in the classroom or at a school assembly" properly rests with the school board. Id.

In 1988, the Court carved out another exception from Tinker for school-sponsored speech. Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). In Hazelwood, the Court upheld a school principal's

decision to delete two articles discussing teen pregnancy and divorce from the school-sponsored newspaper.  The Court held that the school could "exercise editorial content over the style and content of student speech in school-sponsored expressive activities, as long as [doing so is] reasonably related to legitimate pedagogical concerns." Id. at 273.  Distinguishing Tinker, the Court explained that the issue of whether a school must tolerate particular student speech is different from whether the school must affirmatively promote particular speech. Id. at 270.  In sum, "educators are entitled to exercise greater control" over speech that might reasonably be perceived to "bear the imprimatur of the school." Id. at 270-71.

Finally, in the Supreme Court's most recent decision addressing student speech, Morse v. Frederick, the Court held that a school may restrict "student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." 551 U.S. 393.  In Morse, a student attending the Olympic Torch Relay that passed on the street in front of his high school unfurled a 14-foot banner that read "BONG HiTS 4 JESUS." Id. at 397.  The school principal asked that the student take the banner down, and he refused.  The principal confiscated the banner and suspended the student. Id.

In reviewing the disciplinary action in Morse, the Court promulgated a narrow holding decidedly restricted to the facts of the case.  The Court found that the Torch Relay was a school- sponsored event occurring during school hours, which the principal permitted students and faculty to attend. Id. at 397.  Therefore, the court viewed the speech as equivalent to speech occurring in school. Id. at 401 (a student "cannot stand in the midst of his fellow students,

during school hours, at a school-sanctioned activity and claim he is not in school") (internal quotations omitted).  The Court also found that the student's banner condoned illegal drug use.  The Court noted that neither <u>Hazelwood</u> nor <u>Fraser</u> governed its decision, as the student's banner did not bear "the school's imprimatur" nor was it lewd, vulgar, or "plainly offensive."  <u>Id.</u> at 405-06, 409.  Instead, the Court focused on the special characteristics of the school environment and the "governmental interest in stopping student drug abuse" and concluded that schools may restrict student expression at a school-sponsored event that they reasonably regard as promoting illegal drug use.  <u>Id.</u> at 408.[2]

    2.   **Application of the Student Speech Precedents by Lower Courts**

    The Supreme Court has yet to address the factual situation presented by the case at hand – that is, whether a school can regulate student speech or expression that occurs outside the school gates, and is not connected to a school-sponsored event, but that subsequently makes its way onto campus, either by the speaker or by other means. Several lower courts, including the Ninth Circuit, however, have held that a school may regulate such speech under <u>Tinker</u>, if the speech causes or is reasonably likely to cause a material and substantial disruption of school activities.

---

[2]Justice Thomas, in his concurring opinion, expressed concern about the Court's creation of a third carve-out from the rule in <u>Tinker</u>.  Thomas insightfully noted: "[W]e continue to distance ourselves from <u>Tinker</u>, but neither overrule it nor offer an explanation of when it operates and when it does not.  I am afraid that our jurisprudence now says that students have a right to speak in schools except when they don't – a standard continuously developed through litigation against local schools and their administrators." 551 U.S. at 419.  Given the difficulty with which this Court has decided Plaintiff's motion, and the variety of divergent applications of <u>Tinker</u> in the lower courts, the Court shares Justice Thomas' concerns.

In <u>LaVine v. Blaine School District</u>, the Ninth Circuit upheld a school's emergency expulsion of a student, James, who wrote a graphic and violent poem about killing his classmates.  257 F.3d 981 (9th Cir. 2000).  The poem was written off-campus, in the evening, and not as part of any school project.  <u>Id.</u> at 984, 989.  James later brought the poem to campus to show one of his teachers.  The teacher was disturbed by the poem and brought it to the school counselor and eventually to the principal.  After an investigation regarding the poem and James' history, James was expelled.  <u>Id.</u> at 986.

The Ninth Circuit analyzed the speech under <u>Tinker</u>, without giving any consideration to the fact that the poem was drafted outside of school and independent of any school activities.  The court outlined the following framework for applying the Supreme Court student speech precedents: "(1) vulgar, lewd, obscene and plainly offensive speech is governed by <u>Fraser</u>; (2) school-sponsored speech is governed by <u>Hazelwood</u>; and (3) speech that falls into neither of these categories is governed by <u>Tinker</u>."  <u>Id.</u> at 988-89.[3]  Finding that James's poem clearly fell in the third category, "all other speech," the court applied the substantial disruption test from <u>Tinker</u>.  <u>Id.</u> at 989.  The

---

[3] The Ninth Circuit established this framework in the earlier case <u>Chandler v. McMinnville School District</u>, 978 F.2d 524, 529 (9th Cir. 1992).  In <u>Chandler</u>, students were punished for wearing buttons and stickers with the word "Scab" printed on them, in protest of the school's hiring of replacement teachers when many of the school's regular teachers went on strike.  <u>Id.</u> at 526.  The court found that the protest was not lewd or vulgar under <u>Fraser</u> nor was it school-sponsored as in <u>Hazelwood</u>.  Thus, the court concluded that <u>Tinker</u> was the governing standard.  <u>Id.</u> at 529 ("The third category involves speech that is neither vulgar, lewd, obscene, or plainly offensive, nor bears the imprimatur of the school.  To suppress speech in this category, school officials must justify their decision by showing 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'") (quoting Tinker, 393 U.S. at 514).  <u>Chandler</u>, however, did not address student speech originating off-campus.

The same three-part framework was reiterated after the holding in <u>LaVine</u>, in the Ninth Circuit case <u>Pinard v. Chatskanie Sch. Dist. 6J</u>, 467 F.3d 755 (9th Cir. 2006).

Ninth Circuit ultimately concluded that the school was reasonable to portend a substantial disruption and upheld James's expulsion. Id. at 992.

Like LaVine, many other courts analyzing off-campus speech that subsequently is brought to campus or to the attention of school authorities apply the substantial disruption test from Tinker without regard to the location where the speech originated (off campus or on campus). See, e.g., Shanley v. Northeast Independent Sch. Dist., 462 F.2d 960, 970-71 (5th Cir. 1972) (applying Tinker where student-created underground newspaper was authored and distributed off campus, but some of the newspapers turned up on campus); Boucher v. Sch. Bd. of Sch. Dist. of Greenfield, 134 F.3d 821, 827-28 (7th Cir. 1998) (student disciplined for an article printed in an underground newspaper that was distributed on school campus); Killion v. Franklin Reg'l Sch. Dist., 136 F. Supp. 2d 446, 455 (W.D. Pa. 2001) (applying Tinker where student was disciplined for composing degrading top-ten list and distributing it off campus to friends via email, and where one recipient subsequently brought the list to campus); Emmett v. Kent Sch. Dist. No. 415, 92 F. Supp. 2d 1088, 1090 (W.D. Wash. 2000) (applying Tinker to a website created by a student off-campus that contained mock obituaries of some of the author's classmates); Beussink v. Woodland R-IV Sch. Dist., 30 F. Supp. 2d 1175, 1180 (E.D. Mo. 1998) (applying Tinker to a website created by a student off-campus that contained criticism of school authorities, where another student accessed the website at school and showed it to a teacher); O.Z. v. Board of Trustees of Long Beach Unified Sch. Dist., No. CV 08-5671 ODW, 2008 WL 4396895, *4 (C.D. Cal., Sept. 9, 2008) (student discipline upheld under Tinker where

14

student created a video off-campus during spring break that depicted a graphic dramatization of a teacher's murder and then posted the video on the Internet); Pangle v. Bend-Lapine Sch. Dist., 10 P.3d 275, 285-86 (Ct. App. Or. 2000) (applying Tinker to an underground newsletter distributed on campus).

In these cases, the courts have directly applied the Tinker substantial disruption test to determine if a First Amendment violation occurred, without first considering the geographic origin of the speech. As the district court for the Central District of California recently explained in O.Z. v. Board of Trustees: "[T]he fact that plaintiff's creation and transmission of the [speech or expression] occurred away from school property does not necessarily insulate her from school discipline. . . . Off-campus conduct can create a foreseeable risk of substantial disruption within a school." 2008 WL 4396895. In sum, the substantial weight of authority indicates that geographic boundaries generally carry little weight in the student-speech analysis. Where the foreseeable risk of a substantial disruption is established, discipline for such speech is permissible. See Killion, 136 F. Supp. 2d at 455 (holding that the court need not consider plaintiff's argument that a heightened standard applies to speech occurring off school grounds because "the overwhelming weight of authority has analyzed student speech (whether on or off campus) in accordance with Tinker").

Some courts (primarily the Second Circuit), however, have considered the location of the speech to be an important threshold issue for the court to resolve before applying the Supreme Court's student speech precedents. For example, in a recent case involving

communication over the Internet, the Second Circuit considered the nexus between the speech and the school campus.  <u>Wisniewski v. Board of Educ. of the Weedsport Central Sch. Dist.</u>, 494 F.3d 34 (2d. Cir. 2007). In <u>Wisniewski</u>, a middle school student, Aaron, was using AOL Instant Messaging ("IM") software on his home computer.  Aaron created an icon used to identify himself when sending instant messages to his friends. The icon was a small drawing of a pistol firing a bullet at a man's head above which were dots indicating splattered blood.  Beneath the drawing were the words "Kill Mr. Vander-Molen."  Mr. Vander-Molen was Aaron's English teacher.  <u>Id.</u> at 35-36.  Another student printed a copy of the icon and gave it to Mr. Vander-Molen at school, who later brought the matter to the school principal.  <u>Id.</u> at 36.  After disciplinary hearings, Aaron was suspended.

The Second Circuit applied <u>Tinker</u> to the school's decision, but first discussed the nexus between Aaron's icon and the school campus. The court noted that "the panel is divided as to whether it must be shown that it was reasonably foreseeable that Aaron's IM icon would reach the school property or whether the undisputed fact that it did reach the school pretermits any [such] inquiry."  <u>Id.</u> at 39. Ultimately, however, the court concluded that the violent nature of the icon and the fact that Aaron transmitted it via the Internet to 15 of his friends over a three week period made it foreseeable that the icon would eventually come to the attention of the school authorities and Mr. Vander-Molen.  <u>Id.</u> at 39-40. Thus, <u>Tinker</u> applied.

Similarly, in <u>Doninger v. Niehoff</u>, cited by Defendants here, the Second Circuit again considered the location of a student's speech. 527 F.3d 41 (2d. Cir. 2008).  The student in <u>Doninger</u>, Avery, sent an

email to students and parents affiliated with the school and posted a

message on her personal blog criticizing the school for cancelling a

school event.  Avery's email and blog posting encouraged the recipients

to contact the school officials and complain about the cancellation of

the event.  Id. at 44-46.  Applying the rule from Wisniewski to Avery's

speech, the court concluded that it was reasonably foreseeable that

Avery's message would reach the school campus.  Id. at 50.  Indeed, the

message was purposefully designed to come to campus - it encouraged

readers to contact the school and voice their dissatisfaction regarding

the cancelled event.  Id.  Moreover, after the message was posted, the

school received numerous calls and emails from persons concerned about

the event.  Id. at 44.  Thus, there was no dispute that the speech had

its desired effect.  The court concluded that Avery's message was

governed by Tinker, and found that the substantial disruption test was

met.  Id. at 50-52.

    Finally, in J.S. v. Bethlehem Area School District, the Supreme

Court of Pennsylvania analyzed whether J.S. could be disciplined for a

website he created, which contained violent and derogatory comments

about school officials.  807 A.2d 847 (Pa. 2002).  In deciding whether

school discipline was appropriate, the court noted that the "location"

of the speech is the first inquiry.  That is, the court must determine

if the speech was on-campus speech subject to Tinker, or purely off-

campus speech, "which would arguably be subject to some higher level of

First Amendment protection."  Id. at 864.

    Applying the facts of the specific case, the court in Bethlehem

concluded that there was "a sufficient nexus" between the website and

the school campus to warrant application of the Supreme Court's student

speech precedents.  Id.  Notably, J.S. had accessed the website during class and informed other students about it.  Also, members of the faculty accessed the website at school, and school officials were the subjects of the website.  Id. at 865.  In light of these facts, "it was inevitable that the contents of the website would pass from students to teachers."  Id.  The court therefore applied Tinker and found that the website created a substantial disruption.  Id. at 869.

Plaintiff argues in her motion for summary adjudication that the location of the speech (whether on or off campus) is wholly dispositive.  Plaintiff contends that "if the publication of a student's speech does not take place on school grounds, at a school function, or by means of school resources, a school cannot punish the student without violating her First Amendment rights."  (Mot. at 8.)  Thus, Plaintiff contends that because she made the video and posted it on the Internet while off campus and without using the School's equipment, the School had no authority to regulate her conduct.

This argument is not supported by the long line of cases discussed above.  See, e.g., Doninger, 527 F.3d at 50 (where off-campus speech creates a foreseeable risk of substantial disruption within a school, "its off-campus character does not necessarily insulate the student from school discipline.")  Indeed, even those cases in the Second Circuit that analyze the origin of the speech as a relevant consideration have not gone so far as to hold that speech originating off campus can never be regulated.  Nonetheless, the Court will address the authority cited by Plaintiff.

In support of her argument, Plaintiff cites the Second Circuit case Thomas v. Board of Educ., 607 F.2d 1043 (2d. Cir. 1979).  In

Thomas, several students created an independent non-school-sponsored newspaper modeled after National Lampoon, a publication specializing in sexual satire.  The publication was created in the students' homes, off campus, and after school hours.  Id. at 1045.  However, one teacher was aware of the publication and allowed the students to store copies of the newspaper in a classroom closet.  Id.  Apart from the storage on-campus, the authors "assiduously endeavored to sever all connections between their publication and the school."  Id.  They included a disclaimer on the newspaper disclaiming responsibility for copies found on campus.  They printed the papers outside the school and sold the papers after school hours at a store away from the school grounds.  Id. Despite these efforts, a student brought the paper to school, and the authors were punished for its sexual content.  Id. at 1045-46.

The Second Circuit found that Tinker was not applicable because "all but an insignificant amount of relevant activity in this case was *deliberately designed* to take place beyond the schoolhouse gate."  Id. at 1050 (emphasis added).  The court held that, on these facts, the school's authority to punish the speech was governed by the same principals that "bind government officials in the public arena."  Id. The court concluded that the "school officials [were] powerless to impose sanctions for expression beyond school property in this case." Id. at 1050.

While Thomas undoubtedly supports a threshold consideration of the origin of the speech and its relationship to on-campus activity, the holding does not stretch as far as Plaintiff contends.  First, the Thomas court specifically limited its holding to the facts in that case - i.e., where the students took specific efforts to segregate their

speech from campus. _Id._ at 1049.  Second, although the court found

that _Tinker_ did not apply given the "de minimis" connections between

the speech and the school, the court was careful to note that _Tinker_

could apply in a case "where a group of students incites substantial

disruption within the school from some remote locale." _Id._ at 1052

n.17.  The court went on to find that no disruption (or foreseeable

risk thereof) existed, thus obviating the need for any such analysis.

_Id._  Finally, _Thomas_ was decided in 1979, before schools were

confronted by the unique problems presented by student expression

conducted over the Internet.  Subsequent cases interpreting _Thomas_ find

that "territoriality is not necessarily a useful concept in determining

the limit of [school administrators'] authority." _Doninger_, 527 F.3d

at 48-49 (citing _Thomas_, 607 F.2d at 1058 n.13 (Newman, J., concurring

in the result)); _see_ _Layshock v. Hermitage Sch. Dist_. 496 F. Supp. 2d

587, 598 (W.D. Penn. 2007) ("It is clear that the test for school

authority is not geographical.").  This is especially true today where

students routinely "participate in expressive activity . . . via blog

postings, instant messaging, and other forms of electronic

communication." _Doninger_, 527 F.3d at 49.

Plaintiff also cites _Porter v. Parish School Board_, 393 F.3d 608

(5th Cir. 2004), in support of her position.  In _Porter_, a student,

Adam, was expelled when his younger brother unwittingly brought to

school a drawing Adam had made depicting "the school under a state of

siege by a gasoline tanker truck, missile launcher, helicopter, and

various armed persons." _Id._ at 611.  Adam made the drawing at home two

years earlier, and stored the writing pad containing the drawing in his

bedroom closet.  His younger brother found the writing pad at some

point and used it to make his own notations, which he then brought to school.  When the bus driver saw Adam's drawing on one of the pages in the writing pad, she contacted the school authorities and disciplinary action ensued.  Id. at 611-12.

The Fifth Circuit held that "given the unique facts of the present case, we decline to find that Adam's drawing constitutes student speech on the school premises." Id. at 615.  The court recognized that several courts had applied Tinker to speech originating off campus that was later brought to school, citing LaVine, Boucher, Killion, and Beussink, among others.  Id. at 615 n.22.  However, the court found that such cases were factually distinguishable from the present case because, unlike in those cases, Adam "never intended [the drawing] to be brought to campus" and "took no action that would increase the chances that his drawing would find its way to school." Id. at 615. Further, the drawing was not "publicized in a way certain to result in its appearance at [the School]". Id. at 620.  On these facts, the court concluded that the school's disciplinary action violated Adam's First Amendment rights.[4]

Given this background, the Court can draw several general conclusions regarding the application of the Supreme Court's precedents to student expression originating off campus.[5]  First, the majority of courts will apply Tinker where speech originating off campus is brought

---

[4]The Fifth Circuit nonetheless found that the school principal was entitled to qualified immunity, "[g]iven the unsettled nature of First Amendment law as applied to off-campus student speech inadvertently brought on campus by others." Id. at 620.

[5]Notably, even the Supreme Court itself, has expressed some confusion over when its precedents should apply.  Morse, 551 U.S. at 401 ("There is some uncertainty at the outer boundaries as to when courts should apply school-speech precedents.")

to school or to the attention of school authorities, whether by the author himself or some other means.  The end result established by these cases is that any speech, regardless of its geographic origin, which causes or is foreseeably likely to cause a substantial disruption of school activities can be regulated by the school.  Second, some courts will apply the Supreme Court's student speech precedents, including <u>Tinker</u>, only where there is a sufficient nexus between the off-campus speech and the school.  It is unclear, however, when such a nexus exists.  The Second Circuit has held that a sufficient nexus exists where it is "reasonably foreseeable" that the speech would reach campus.  The mere fact that the speech was brought on campus may or may not be sufficient.  Third, in unique cases where the speaker took specific efforts to keep the speech off campus (<u>Thomas</u>), or clearly did not intend the speech to reach campus and publicized it in such a manner that it was unlikely to do so (<u>Porter</u>), the student speech precedents likely should not apply.  In these latter scenarios, school officials have no authority, beyond the general principles governing speech in a public arena, to regulate such speech.

Applying these principles to the case at hand, the Court finds that Plaintiff's geography-based argument - i.e., that the School could not regulate the YouTube video because it originated off campus - unquestionably fails.  First, under the majority rule, and the rule established by the Ninth Circuit in <u>LaVine</u>, the geographic origin of the speech is not material; <u>Tinker</u> applies to both on-campus and off-campus speech.

Moreover, even if the Court were to apply the Second Circuit's approach, which requires that some threshold consideration be given to

the location of the speech, the YouTube video clearly has a sufficient connection to the Beverly Vista campus.  Here, there is no dispute that the YouTube video actually made its way to the School.  The subject of the video, C.C., came to the School with her mother on May 28, 2008 specifically to make the School aware of the video.  The video was viewed at least two times on the school campus, once by Lue-Sang and once by R.S. and her father in the administration offices.  Thus, the speech was brought to campus.

Further, it was reasonably foreseeable that Plaintiff's video would make its way to campus.  Plaintiff posted her video on the Internet, on a site readily accessible to the general public.  Cases considering the relationship between off-campus speech and the school campus more readily find a sufficient nexus exists where speech over the Internet is involved.  See Wisniewski, 494 F.3d 34; Doninger, 527 F.3d 41.  Additionally, Plaintiff posted the video on a week night and deliberately contacted 5 to 10 students from the School and told them to watch the video on YouTube.  See Wisniewski, 494 F.3d at 48-49 (the fact that student transmitted his icon to 15 classmates increased the likelihood that it would reach the school campus).  Plaintiff also contacted the subject of the video, C.C., and told her to watch the video.  Plaintiff knew that C.C. was upset by the video.

Finally, the content of the video increases the foreseeability that the video would reach the School.  The students in the video make derogatory, sexual, and defamatory statements about a thirteen-year-old classmate.  One student calls C.C. "a slut," "spoiled," and an "ugly piece of shit."  J.C. specifically encourages the mean-spirited discussion, telling R.S. "to continue with the Carina rant."  The

students collectively gang up on C.C. to the point where one of them even asks, "Am I the only one that doesn't hate Carina?" (J.C. Supporting Decl., Exh. A [YouTube video].) Given this commentary, it is not surprising that a parent made aware of the video would be sufficiently upset to bring the matter to the attention of the School.

Plaintiff argues that it was not foreseeable that the video would come to campus because students are not able to access the YouTube website on the School's computers. (Pl. Mot. for Summ. Judgmt. at 9.) Although some students may be able to access the Internet on their cell phones, it is undisputed that students are also prohibited from using their cell phones while at school. (Id.) Defendants have not produced any evidence that a student accessed the video on his or her cell phone while at school.

While these facts certainly are part of the analysis, they are far from dispositive. Plaintiff ignores the fact that school administrators had the ability to access the video at School; thus, once an administrator became aware of the video, it could be played on the school campus. Indeed, this is exactly what happened here. A student was upset about the video and specifically brought it to the school's attention. Several cases have applied Tinker where speech published or transmitted via the Internet subsequently comes to the attention of school administrators, even where there is no evidence that students accessed the speech while at school. See, e.g., Wisniewski, 494 F.3d 34 (applying Tinker where a friend of plaintiff's printed his violent AOL Instant Message icon off the computer and brought it to a teacher); Killion, 136 F. Supp. 2d at 455 (applying

<u>Tinker</u> where student emailed friends a degrading top ten list and one recipient printed the list and brought it to school); <u>O.Z.</u>, 2008 WL 4396895 (teacher discovered a violent and disturbing video created by students and posted on the Internet by searching her own name on Google.com, and later brought it to the attention of school authorities). Thus, it is not necessary that students access the speech while at school. Further, the fact that Plaintiff encouraged students to watch the video and specifically alerted C.C. about it, makes it reasonably likely that someone would alert the School officials about the video.

Finally, this case is easily distinguishable from <u>Thomas</u> and <u>Porter</u>. The plaintiffs in <u>Thomas</u> made concerted efforts to keep their newspaper off campus. Plaintiff here made no such effort; instead, she deliberately contacted some of her classmates to tell them about the video. This fact alone brings this case outside the ambit of <u>Thomas</u>. Further, in <u>Porter</u>, the plaintiff put his drawing in a closet at home where it remained for over two years before it was inadvertently transported to school by his younger brother. Here, in contrast, it took less than 24 hours for Plaintiff's video to reach the School, a fact weighing in favor of foreseeability. The method of transmission, over the Internet, was also much broader than in <u>Porter</u> and designed in such a manner to reach many persons at once. Finally, because Plaintiff contacted her classmates, it cannot be said that she "took no action that would increase the chances that [the speech] would find its way to school." <u>Porter</u>, 393 F.3d at 615.

Thus, the Court concludes that the Supreme Court precedents apply to Plaintiff's YouTube video, and that <u>Tinker</u> governs the present

dispute.  Clearly, <u>Hazelwood</u> and <u>Morse</u> do not apply.  No one could argue that the YouTube video bore the "imprimatur" of the School, like the school newspaper in <u>Hazelwood</u>.  Further, the YouTube video was not made or transmitted in connection with a school-sponsored event and does not condone illegal drug use; thus, <u>Morse</u> does not apply.

<u>Fraser</u> is also inapplicable.  Although J.C.'s video certainly contains language that is lewd, vulgar, and plainly offensive, the rule in <u>Fraser</u> is limited to speech that occurs in school.[6]  Indeed, the Supreme Court in <u>Hazelwood</u> expressly interpreted the holding in <u>Fraser</u> as follows:

> A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government *could not sensor similar speech outside the school*.  Accordingly, we held in <u>Fraser</u> that a student could be disciplined for having delivered a speech that was 'sexually explicit' but not legally obscene at an official school assembly, because the school was entitled to 'disassociate itself' from the speech in a manner that would demonstrate to others that such vulgarity is 'wholly inconsistent with the 'fundamental values' of public school education.

<u>Hazelwood</u>, 484 U.S. at 266-67 (emphasis added); <u>see also Hedges v. Wauconda Community Unit Sch. Dist. No. 118</u>, 9 F.3d 1295, 1300-01 (7th Cir. 1993) (Easterbrook, J.) ("We know from <u>Bethel School District no. 403 v. Fraser</u>, that a high school may insist on civility when students speak, even though government has no such power outside school doors.") (internal citation omitted); <u>Saxe v. State College Area Sch. Dist.</u>, 240 F.3d 200, 213 (3d. Cir. 2001) (Alito, J.) ("According to <u>Fraser</u>, then, there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech *in school*.) (emphasis added).  The Court is not aware of any authority from the circuit

---

[6] Neither party argues that <u>Fraser</u> should apply to this case.

courts applying <u>Fraser</u> to speech that takes place off campus.[7] Moreover, the reasoning of <u>Fraser</u>, which is anchored in the school's duty to teach norms of civility to its students, does not support extending <u>Fraser</u> to lewd or offensive speech occurring off campus.  For these reasons, the Court will not apply <u>Fraser</u> to Plaintiff's YouTube video.

In sum, the Court finds that the YouTube video clearly falls into the "all other speech" category, governed by <u>Tinker</u>.  <u>See</u> <u>LaVine</u>, 257 F.3d at 989.  The final issue for the Court to resolve, therefore, is whether J.C.'s speech created, or was reasonably likely to have created, a substantial disruption of school activities.

### 3.    **Substantial Disruption**

The Supreme Court in <u>Tinker</u> established that a school can regulate student speech if such speech "materially and substantially disrupt[s] the work and discipline of the school."  393 U.S. at 513.  This standard does not require that the school authorities wait until an actual disruption occurs; where school authorities can "reasonably portend disruption" in light of the facts presented to them in the particular situation, regulation of student expression is permissible.

---

[7] The Court is aware of an unreported case from the Middle District of Pennsylvania that applied <u>Fraser</u> to off-campus speech that was posted on the Internet.  <u>J.S. v. Blue Mountain Sch. Dist.</u>, No. 3:07cv585, 2008 WL 4279517 (M.D. Pa., Sept. 11, 2008) (discussed further <u>infra</u> section III.B.3.a.).  The court in <u>J.S.</u> relied, in part, on a 1976 case from the same district in which the court upheld a student's suspension where the student saw a teacher at a shopping mall on a Sunday afternoon and told a friend "He's [the teacher] a prick."  <u>Id.</u> at *7 (discussing <u>Fenton v. Stear</u>, 423 F. Supp. 767 (W.D. Pa. 1976)).  This Court finds the reasoning in <u>J.S.</u> unpersuasive.  Furthermore, the holding in <u>Fenton</u> demonstrates the precise danger of extending <u>Fraser</u> to allow schools to regulate of student speech occurring off campus simply because it is lewd, vulgar or offensive, and without regard to the effect that speech has on school activities.  This Court does not wish to see school administrators become censors of students' speech at all times, in all places, and under all circumstances.  <u>See</u> <u>Thomas v. Board of Educ., Granville Central Sch. Dist.</u>, 607 F.2d 1043, 1052 (2d. Cir. 1979).  Such broad authority would clearly intrude upon the rights of parents to "direct the rearing of their children."  <u>Reno v. ACLU</u>, 521 U.S. 844, 865 (1997).

Id. at 514; LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001) ("Tinker does not require school officials to wait until disruption actually occurs before they may act."). As the Sixth Circuit recently explained, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." Lowery v. Euverard, 497 F.3d 584, 596 (6th Cir. 2007).

Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome the student's right to freedom of expression. Id. at 508. In other words, the decision to discipline speech must be supported by the existence of specific facts that could reasonably lead school officials to forecast disruption. LaVine, 257 F.3d at 989. Finally, school officials must show that the regulation or prohibition of student speech was caused by something more than "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Tinker, 393 U.S. at 509. As the Supreme Court explained: "Any word spoken in a class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." Id. (citing Terminiello v. Chicago, 337 U.S. 1 (1949)).

### a.   Existing Case Law

The substantial disruption inquiry is highly fact-intensive. Perhaps for that reason, existing case law has not provided clear guidelines as to when a substantial disruption is reasonably foreseeable. There is, for example, no magic number of students or

classrooms that must be affected by the speech.  One court has held that a substantial disruption requires something more than "a mild distraction or curiosity created by the speech" but need not rise to the level of "complete chaos."  <u>J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.</u>, 807 A.2d 847, 868 (Pa. 2002).  Not surprisingly, however, the gulf between those two concepts swallows the vast majority of factual scenarios.  Further complicating matters is the fact that the Court has not uncovered any cases, in this Circuit or otherwise, that address  speech targeted at a particular student, as is the case here. That being said, the Court has observed from the case law that  certain factors are relevant to the substantial disruption analysis.

First, the fact that students are discussing the speech at issue is not sufficient to create a substantial disruption, at least where there is no evidence that classroom activities were substantially disrupted.  <u>See Tinker</u>, 393 U.S. at 514; <u>Bethlehem Area Sch. Dist.</u>, 807 A.2d at 868.  In <u>Tinker</u>, the Court held that the students' wearing black armbands to school in protest of the Vietnam War did not cause a substantial disruption.  <u>Id.</u>  The evidence showed that the armbands caused students to make comments, to poke fun at the students wearing the armbands, and caused one student to feel "self-conscious" about attending school with his armband.  <u>Id.</u> at 517 (J. Black, dissenting) (discussing facts relating to substantial disruption).  One mathematics teacher also had his classroom temporarily "wrecked" by disputes with one student wearing an armband.  <u>Id.</u>  Nonetheless, the majority concluded that the students wearing armbands "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others."  <u>Id.</u> at 514.  The Court found: "They caused

1  discussion outside of the classrooms, but no interference with work and
2  no disorder." Id.

3      In a recent case out of the Middle District of Pennsylvania, J.S.
4  v. Blue Mountain School District, the district court concluded that the
5  substantial disruption test was not met on the basis of general
6  discussion or student comments regarding a student's speech.  No.
7  3:07cv585, 2008 WL 4279517 (M.D. Pa., Sept. 11, 2008).  In Blue
8  Mountain, a student, K.L., created a fake profile of her school
9  principal, McGonigle, on the website MySpace.com using her home
10  computer.  Id. at *1.  The profile included McGonigle's picture,
11  described him as a pedophile and a sex addict, and included a message
12  purporting to solicit young children for sexual acts.  Id.  News of the
13  profile "soon spread to the school," and roughly 5-8 students
14  approached K.L. to discuss it.  Id.  Discussion of the website
15  "continued through the day, . . . with quite a few people knowing about
16  it."  Id.  When the profile was brought to the attention of school
17  authorities, the school suspended K.L. for 10 days.  Id. at *2.

18      The district court ultimately concluded that K.L.'s fake profile
19  was lewd, offensive, and could have been the basis for criminal
20  charges; thus, the court analyzed K.L.'s speech under Fraser.  Id. at
21  *6.  Nonetheless, the court found that, had Tinker applied to this
22  case, a substantial disruption did not occur on these facts.  Id. at
23  *7.  The mere "buzz" about the profile, standing alone, was not
24  sufficient under Tinker to constitute a substantial disruption.  See
25  id.; see also, Layshock v. Hermitage School Dist., 496 F. Supp. 2d 587,
26  600 (W.D. Pa. 2007) (on substantially similar facts, the court found
27  that student discussions regarding an unflattering MySpace profile of a
28

school principal did not cause a substantial disruption where no classes were cancelled and no "widespread disorder" ensued.).

Thus, the mere fact that students are discussing the speech, without more, likely will be insufficient to meet the Tinker standard.

Where a student's speech is violent or threatening to members of the school, several courts have found that a school can reasonably portend substantial disruption. For example, in Lavine v. Blaine School District, 257 F.3d 981 (2001), the Ninth Circuit found that where a student showed a teacher a violent poem he had written that explicitly described a mass shooting of his classmates and his own suicide, the school was reasonable to forecast substantial disruption. The evidence demonstrated that the student had previously discussed his suicidal tendencies with the school counselor, and the school was aware that he had been involved in a domestic dispute with his father and had to leave his family home. Id. at 984. The school also knew that the student had recently broken up with his girlfriend and had been accused of stalking her. Id. The student had a prior discipline record at the school, including one act of violence. Id. at 989. Finally, the school was aware of several school shootings that had recently occurred at other campuses. Id. Calling this "a close case in retrospect," the Ninth Circuit found on these facts that the school officials were reasonable to portend substantial disruption and possible violence. Id. at 983. Thus, the court upheld the student's emergency expulsion.

Similarly, in J.S. v. Bethlehem, J.S. created a website that included violent and threatening comments and images about the school principal and a teacher, Mrs. Fulmer. 807 A.2d 847 (Pa. 2002). One page on J.S.'s website included a drawing of Fulmer with her head cut

off and blood dripping from her neck and was captioned, "Why Should She

Die?" Id. at 851.  It also solicited readers for money to pay for a

hit man to kill Fulmer.  Id.  When Fulmer learned of the website, she

was frightened, suffered anxiety and was unable to teach for the rest

of the school year.  Id. at 852.  Three substitute teachers were

retained to teach her class.  Id.  The school also found that the

effect of the website on the students' morale was "comparable to [that

of] the death of a student or staff member."  Id.  Finally, parents

also voiced concerns to the school regarding their children's safety

and the quality of instruction by the substitute teachers.  Id.  On the

basis of this record, the court concluded that "the web site created

disorder and significantly and adversely impacted the delivery of

instruction . . . to a magnitude the satisfies the requirements of

Tinker."  Id. at 869.

LaVine and Bethlehem both involved additional factors beyond the

violent nature of the speech – e.g., the student's disciplinary past or

the teacher's inability to return to school – that supported a finding

of substantial disruption.  Nonetheless, other courts have found a

foreseeable risk of substantial disruption based solely on the violent

content of the speech.  For example, in O.Z. v. Board of Trustees of

the Long Beach Unified School District, a court in this district

recently held that it was reasonable for the school to portend

substantial disruption where a student created a graphic video-

dramatization of her teacher's murder.  No. CV 08-5671 ODW (AJWx), 2008

WL 4396895 (C.D. Cal., Sept. 9, 2008).  The student created the video

during the spring break recess from school using her home computer, and

posted the video on the YouTube.com website.  Id. at *1.  The teacher

featured in the video, Rosenlof, came across it while searching her own

name on the Internet through "Google." Id. Rosenlof was upset by the

video, and informed the principal about the it. The school officials

conducted an investigation by contacting O.Z. and her mother. Id.

Although there was no evidence that the video had made its way to

campus or had caused any actual disruption in school activities, the

school decided to transfer O.Z to another school. Id. O.Z.

subsequently brought an action seeking a preliminary injunction to

require the school to reenroll her at Hughes Middle School. Id. at *2.

The court denied the preliminary. Id. at *6.

　　In addressing the likelihood of success of O.Z.'s First Amendment

claim, the district court found that "it would appear *reasonable*, given

the violent language and unusual photos depicted in the slide show, for

school officials to forecast substantial disruption of school

activities." Id. at *3. (emphasis in original). The court explained:

"If anything had happened to Mrs. Rosenlof at school, either a physical

attack by O.Z. or ridicule directed at Mrs. Rosenlof by other students,

it would substantially disrupt the school's activities. These are just

some of the facts that might reasonably lead school officials to

forecast substantial disruption." Id. at *4 (emphasis added).

　　Similarly, in Wisniewski (discussed above), the Second Circuit

concluded that, given the violent nature of plaintiff's Internet icon,

which depicted a teacher being shot in the head, "[T]here can be no

doubt that the icon, once made known to the teacher or other school

officials, would foreseeably create a risk of substantial disruption."

494 F.3d 34, 40 (2d. Cir. 2007). Id.; but see Mahaffey v. Aldrich, 236

F. Supp. 2d 779, 784 (E.D. Mich. 2002) (finding no substantial

disruption where police notified the school of a student-created website that instructed readers to kill a person of their choosing in a specifically-described, gruesome fashion, but there was no evidence that the website was accessed at school, or that it "interfered with the work of the school" or "that any other student's rights were impinged.")

O.Z. and Wisniewski support the proposition that the content of the speech alone may be a sufficient basis upon which to reasonably predict a substantial disruption, at least where the speech is violent or threatens harm to a person affiliated with the school.

Another factor relevant to the substantial disruption inquiry is whether school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech.  For example, in Doninger v. Neihoff (discussed above), the Second Circuit found that Avery's email message and blog posting about a purportedly cancelled school event, "Jamfest," created a substantial disruption because school officials were required to deal with a "deluge of calls and emails" related to the event.  527 F.3d 41, 51 (2d. Cir. 2008). School officials had to quell angry parent and student concerns due to the misinformation contained in Avery's messages, and missed or were late to school-related activities as a result.  Id.  Further, the court noted that several students who participated in crafting the mass email were pulled out of class to "manage the growing dispute."  Id.  The students in general were "all riled up" thinking that Jamfest had been cancelled, and there was evidence that "a sit-in was threatened because students believed the event would not be held."  Id. The court

concluded: "It was foreseeable in this context that school operations might well be disrupted further . . . ." Id.

Similarly, in Boucher v. School Board of the School District of Greenfield, 134 F.3d 821 (7th Cir. 1998) the fact that school officials had to devote time and energy to the harm created by the student's speech supported a finding of substantial disruption. In Boucher, a student, Justin, distributed an underground newspaper that instructed students as to how to hack into the school's computers and published the school's restricted access codes. Id. at 822. When the school discovered who the author was, they expelled Justin. Id. at 823. Justin subsequently brought an action requesting a preliminary injunction to set aside the expulsion. Id. The district court granted the request, but the Seventh Circuit reversed. Id. at 829.

Although the Seventh Circuit's analysis primarily focused on the balance of hardships, it also found that the School Board likely would prevail on the merits of Justin's First Amendment claim. The court noted that, as a response to the article, the school had to call in technology experts to perform four hours of diagnostic tests on the computer system. Id. at 827. The experts noticed some evidence of computer tampering, but could not tie it directly to Justin's article. Id. The school also had to change all the passwords mentioned in the article. Id. The court found that, "this is, at a minimum, *some* evidence of past disruption, which would support an inference of potential future disruption. . . ." Id. Thus, the effort expended by the school to address the article weighed in favor of finding a risk of substantial disruption. Id.; Cf. Layshock v. Hermitage School Dist., 496 F. Supp. 2d 587, 601 (W.D. Pa. 2007) (implying that where the

school's response itself, as opposed to the underlying student speech, is the cause of substantial disruption, discipline may not be appropriate).[8]

Finally, the Court must consider whether the school's decision to discipline is based on <u>evidence</u> or <u>facts</u> indicating a foreseeable risk of disruption, rather than undifferentiated fears or mere disapproval of the speech. In <u>Beussink v. Woodland R-IV School District</u>, the court granted a preliminary injunction in favor of the student on a First Amendment claim, finding that the principal's disciplinary measure was based on his emotional reaction to the speech, rather than any risk of

---

[8]<u>Layschock v. Hermitage School District</u> appears to be somewhat of an outlier. 496 F.Supp. 2d 587 (W.D. Pa. 2007). In <u>Layshock</u>, a student named Justin created an unflattering Internet profile of his school principal, Trosh, on the website MySpace.com. <u>Id.</u> at 591. There was evidence that Justin accessed the profile at school on December 15, 2005 and showed it to other students, and that several other students also accessed the profile during a computer class. <u>Id.</u> at 591-92. Trosh learned about Justin's profile the same evening, and also learned of several other unflattering profiles of Trosh on MySpace, which were created by other students. <u>Id.</u> at 591.

The next morning, Trosh called a faculty meeting and told the teachers to send any students who were discussing the profiles in class to the principal's office. Roughly twenty students were sent to the office that day. <u>Id.</u> at 592. The school limited computer use from December 16 through December 21, which was the last day of school before the holiday recess. <u>Id.</u> at 593. Computer programming classes were cancelled, and several teachers had to make revisions to their lesson plans so as to curb student access to computers in class. <u>Id.</u> at 592-93. The school technology coordinator disabled access to the MySpace website on December 19, and spent roughly 25% of his time that week on issues relating to the profiles. <u>Id.</u> at 593. On January 3, 2006, the school suspended Justin. <u>Id.</u>

In a somewhat confusing opinion, the district court concluded both that "this decision is a close call," but also that "a reasonable jury could not conclude that the 'substantial disruption' standard could be met on this record." <u>Id.</u> at 600, 601. Although it was clear that school officials had devoted a good amount of time and energy to the issue, the Court found that "the actual disruption was rather minimal-no classes were cancelled, no widespread disorder occured, there was no violence or student disciplinary action." <u>Id.</u> at 600. Further, there was some evidence that the "buzz" and student discussions were caused by the reaction of the administrators, not the profile itself. <u>Id.</u> ("Indeed, Plaintiffs point to instances in the record in which students objected to the investigation, rather than the profile.").

But perhaps the most compelling reason for the court's holding, which distinguishes it from both <u>Doninger</u> and <u>Boucher</u>, was that three other profiles of Trosh existed on MySpace.com and were accessed by the students on campus during the same time frame. <u>Id.</u> This created a causation problem because the "School District [was] unable to connect the alleged disruption to Justin's conduct [as opposed to the other profiles]." <u>Id.</u> For these reasons, the court granted summary judgment to Justin on his First Amendment claim.

disruption.  30 F. Supp. 2d 1175 (E.D. Mo. 1998).  In <u>Beussink</u>,
plaintiff had created a website criticizing the school administration.
<u>Id.</u>  Another student discovered the website and accessed it at school
to show it to a teacher.  <u>Id.</u> at 1177-78.  The teacher went directly to
the principal to inform him of the site, who viewed the website and was
upset.  <u>Id.</u> at 1178.  The principal testified that he made the decision
to discipline plaintiff "immediately upon viewing the homepage . . .
because he was upset that the homepage's message had been displayed in
one of his classrooms."  <u>Id.</u>  The website was accessed twice more by
students that day and some teachers discussed it with students;
however, there was no disruption to class work.  <u>Id.</u> at 1179.

The court concluded that the school disciplined plaintiff because
the principal was upset, and "not based on a fear of disruption or
interference . . . (reasonable or otherwise)."  <u>Id.</u>  Thus, the
discipline failed to meet the requirements of <u>Tinker</u>.  <u>Id.</u>; <u>see also</u>,
<u>Killion v. Franklin Regional Sch. Dist.</u>, 136 F. Supp. 2d 446 (W.D. Pa.
2001) (granting plaintiff summary judgment on First Amendment claim
where the only evidence relating to substantial disruption was that two
teachers were upset by plaintiff's rude top-ten list, and the list had
been on school grounds for nearly a week without any disruption before
the discipline was imposed); <u>Saxe v. State College Area Sch. Dist.</u>, 240
F.3d 200 (3d. Cir. 2001) (Alito, J.) (finding a school's anti-
harassment policy overbroad, and stating that "the mere fact that
someone might take offense at the content of speech is not sufficient
justification for prohibiting it.").

In <u>Bowler v. Town of Hudson</u>, the District Court of Massachusetts
held that a school's fear of disruption was too attenuated to warrant

student discipline.  514 F. Supp. 2d 168 (D. Mass 2007).  In Bowler,
plaintiffs created a non-school sponsored club promoting "pro-American,
pro-conservative dialogue and speech."  Id. at 172.  They placed
posters advertising the club on school walls and bulletin boards.  Id.
at 173.  The posters listed a website address for an affiliated
national club; the website contained links to violent and disturbing
images, including "brutal beheadings."  Id.  When school officials
discovered this, they removed all the posters and disabled student
access to the website from school grounds.  Id.  Over the several
months that followed, school officials repeatedly told plaintiffs that
they could not advertise the website on any posters placed on school
grounds, and eventually adopted policies requiring all students to
secure prior approval for any posted material and forbidding any web
addresses from being listed on posters.  Id. at 174-75.  Plaintiffs
brought an action against the school, the town, and school officials
for unlawful censorship under the First Amendment.  Id. at 171.

    Defendants moved for summary judgment, arguing that censorship was
permissible under Tinker because the graphic content of the videos on
the website "threatened to materially disrupt school operations."  Id.
at 177.  Specifically, the school argued that students who viewed the
videos might suffer a negative psychological reaction and "require
counseling to cope with their subsequent feelings of helplessness and
despair."  Id. at 178.  The district court rejected this argument as
entirely too speculative.  Id.  The court noted that in order for this
predicted parade of horribles to occur students would have to (1) view
the posters, (2) access the website outside school, (3) discover the
links to the disturbing videos, (4) navigate past an express warning,

(5) click on the videos, and (6) be disturbed and seek counseling.  <u>Id.</u>

at 177-78.  The court found no <u>evidence</u> that the videos would result in

a substantial interference, and the mere <u>risk</u> that student counseling

or unplanned classroom discussions may be required was not sufficient.

<u>Id.</u> at 178. The school's actions, therefore, could not be justified

under <u>Tinker</u>.

In contrast, where "a school can point to a well-founded

expectation of disruption - especially one based on past incidents

arising out of similar speech - the restriction may pass constitutional

muster."  <u>Saxe</u>, 240 F.3d at 212.  For example, in <u>West v. Derby Unified</u>

<u>School District No. 260</u>, the Tenth Circuit upheld a student's

suspension for drawing a Confederate flag in violation of the school's

policy against racial harassment.  206 F.3d 1358 (10th Cir. 2000).  In

so doing, the Tenth Circuit adopted the following reasoning from the

district court:

> School officials in Derby had evidence from which they could
> reasonably conclude that possession and display of
> Confederate flag images, when unconnected with any legitimate
> educational purpose, would likely lead to a material and
> substantial disruption of school discipline.  The district
> experienced a series of racial incidents or confrontations in
> 1995, some of which were related to the Confederate flag.
> The incidents included hostile confrontations between a group
> of white and black students at school and at least one fight
> at a high school football game. . . . The history of racial
> tension in the district had made administrators' and parents'
> concerns about future substantial disruptions from possession
> of Confederate flag symbols at school reasonable.

<u>Id.</u> at 1366; <u>Cf.</u> <u>Chalifoux v. New Caney Independent Sch. Dist.</u>, 976 F.

Supp. 659 (S.D. Tex. 1997) (school violated First Amendment by

prohibiting devout Catholic students from wearing rosaries in violation

of a dress code prohibiting gang-related apparel where there was no

evidence that plaintiffs were misidentified as gang members or that

they attracted the attention from other students because of the
rosaries).  Thus, where the school can demonstrate a prior history of
disruptions caused by the type of speech at issue, this weighs strongly
in favor of finding that the school's prediction of disruption was
reasonable.

### b.    Application to the Current Record on Summary Judgment

Based on the undisputed facts, and viewing all reasonable
inferences in favor of the Defendants, the Court finds that no
reasonable jury could conclude that J.C.'s YouTube video caused a
substantial disruption to school activities, or that there was a
reasonably foreseeable risk of substantial disruption as a result of
the YouTube video.

### i.    Actual Disruption

First, what the Defendants contend was an actual disruption is
entirely too *de minimis* as a matter of law to constitute a substantial
disruption.  Interpreting the facts in the most favorable light for
Defendants, at most, the record shows that the School had to address
the concerns of an upset parent and a student who temporarily refused
to go to class, and that five students missed some undetermined portion
of their classes on May 28, 2008.  This does not rise to the level of a
substantial disruption.

Unlike in the many cases in which courts have found a substantial
disruption (LaVine, Wisniewski, O.Z., and Bethlehem) J.C.'s video was
not violent or threatening.  There was no reason for the School to
believe that C.C.'s safety was in jeopardy or that any student would
try to harm C.C. as a result of the video.  Certainly, C.C. never

testified that she feared any type of physical attack as a result of the video.  Instead, C.C. felt embarrassed, her feelings were hurt, and she temporarily did not want to go to class.  These concerns cannot, without more, warrant school discipline.  The Court does not take issue with Defendants' argument that young students often say hurtful things to each other, and that students with limited maturity may have emotional conflicts over even minor comments.  However, to allow the School to cast this wide a net and suspend a student simply because another student takes offense to their speech, without any evidence that such speech caused a substantial disruption of the school's activities, runs afoul of Tinker.

Moreover, the evidence demonstrates that C.C.'s hurt feelings did not cause any type of school disruption.  C.C. did not confront J.C. or any of the other students involved in the video, either verbally or physically, while at school, nor did she indicate any intention to do so.  Further, while C.C. was undoubtedly upset, it took the school counselor, at most, 20-25 minutes to calm C.C. down and convince her to go to class.  (Def. ACF 10.)  Although the time line is not entirely clear, C.C. likely missed no more than a single class on the morning of May 27, 2008.  (Allen Supporting Decl., Exh. N [Lue Sang Depo. at 15:4-11].)

Other students also missed some of their classes on May 28, 2008 as a result of the School's investigation of the YouTube video.  However, there is no evidence that the school's investigation had any ripple effects on class activities or the work of the School.  For example, it appears that the students involved in the video simply left class when asked, quietly and without incident.  Hart testified that

the entire investigation was resolved and all the students returned to class before the lunch recess on May 28, 2008. (Declaration of John Allen In Support of Def.'s Mot. For Summary Judgment ["Allen Supporting Decl."], Exh. Q. [Hart Depo. at 20:14-23] [testifying that J.C. was called the administrative office between 9:30 a.m. and 10:15 a.m., and the whole incident relating to the video was over before lunch that day].) Further, there appears to have been no classroom disruption upon these students returning to class.

There is also no evidence that the video itself had any effect on classroom activities. No widespread whispering campaign was sparked by the video; no students were found gossiping about C.C. or about the video while in class. As far as the record demonstrates, not a single student watched the video while at school. Moreover, while J.C. testified that she saw 5 to 10 students talking about the video on campus on the morning of May 28, there is no evidence that this discussion occurred during class or that it otherwise disrupted school work. More importantly, the record is silent as to whether the individual Defendants, or even C.C., were aware of the discussion among those 5 to 10 students on May 28, 2008; thus, the discussion could not have informed the School's decision to suspend J.C.

It appears that the most significant effects of the video were that J.C. and R.S. were sent home from school, and that J.C. was suspended for two days.[9] Clearly, however, the School cannot point to the discipline itself as a substantial disruption.

---

[9] Defendants contend that it was R.S.'s father who took her out of school for the day as a result of the video. (Def.'s ACF 12.) However, Lue-Sang's testimony establishes that she asked R.S.'s father to take R.S. out of school for the day. (Allen Supporting Decl., Exh. P [Lue Sang Depo. at 79:2-22].) Thus, although no formal disciplinary action was taken against R.S., the record is clear that she was taken out of school at Defendants' request.

1   Defendants argue, in part, that a substantial disruption occured,

2   as in <u>Doninger</u>, because the three individual defendants "were taken

3   away from other tasks in order to deal with the disruption created by

4   Plaintiff's conduct." (Opp'n at 9.)  The Court disagrees.  <u>Doninger</u> is

5   readily distinguishable from the present case because, in <u>Doninger</u>, the

6   school officials introduced evidence that, over the course of two days,

7   they had to miss or arrive late to several other school events to deal

8   with the controversy caused by Avery's speech.  527 F.3d at 51.  For

9   several days, the school officials had to respond to "a deluge" of

10  calls and emails from angry students and parents and had to take action

11  to quell a threatened "sit-in" by the students.  <u>Id.</u>  Thus, the

12  disruption created in <u>Doninger</u> was highly out of the ordinary, not a

13  response to the every day emotional conflicts that students often get

14  into.[10]

15  Here, in contrast, Defendants have presented <u>no evidence</u> that they

16  missed or were late to any other school activities, nor have Defendants

17  shown that the actions they took to resolve the situation created by

18  the video were outside the realm of ordinary school activities.

19  Instead, the record demonstrates that Hart and Lue-Sang took steps to

20  investigate the nature of the conflict between J.C. and C.C., to

21  counsel C.C. when she was upset, and to decide, along with Warren's

22  input, whether to impose discipline.  That is what school

23  administrators do.  As long as students have attended school, some get

24  sent to the principal's office for possible discipline, some seek

25  counseling from the school counselors, and upset parents on occasion

26

27  [10] This is also true in <u>Boucher</u>, 134 F.3d 821, (discussed above).  There, the school
    had to call in technology experts to perform diagnostic tests on the school
    computers and change all the access codes.  <u>Id.</u> at 827-28.  Clearly, this in not
28  within the realm of normal, every-day school activities.

43

voice concerns to the school, whether it be about a child's poor

grades, a student-teacher personality conflict, or otherwise.  There is

nothing in the record to demonstrate that J.C.'s conduct presented an

unusual or extraordinary situation like that in <u>Doninger</u>, or even in

<u>Boucher</u>.[11]

In sum, Defendants have not presented any evidence demonstrating

that they were pulled away from their ordinary activities as a result

of the YouTube video.

For the <u>Tinker</u> test to have any reasonable limits, the word

"substantial" must equate to something more than the ordinary

personality conflicts among middle school students that may leave one

student feeling hurt or insecure.  Likewise, the Court finds that the

mere fact that a handful of students are pulled out of class for a few

hours at most, without more, cannot be sufficient.  <u>Tinker</u> establishes

that a material and substantial disruption is one that affects "the

work of the school" or "school activities" in general.  <u>See Tinker</u>, 393

U.S. at 509, 514.  Thus, while the precise scope of the substantial

disruption test is still being sketched by lower courts, where

discipline is based on actual disruption (as opposed to a fear of

pending disruption), the School's decision must be anchored in

something greater than one individual student's difficult day (or hour)

on campus.  <u>See</u>, <u>e.g.</u>, <u>J.S. v. Bethlehem</u>, 807 A.2d at 854 (the effect

of the website on the morale of the students and staff in general were

---

[11] Defendant Hart is a perfect illustration.  Hart is the school counselor at
Beverly Vista Middle School.  Presumably , her primary obligation is to counsel
students who are upset or who may be subject to school discipline.  It cannot be
said, therefore, that Hart was torn away from her regular activities on May 28,
2008, when in fact, her very purpose at Beverly Vista is to counsel the student
body.  The same can be said of Lue-Sang.  No reasonable jury could conclude that an
administrative principal was pulled away from her usual tasks by consulting with
the principal to decide whether to discipline a child.

comparable to the death of a student or staff member); <u>Doninger</u>, 527 F.3d at 51 (plaintiffs' speech had the entire school all "riled-up" and students were threatening a protest).  The record on summary judgment does not present a disruption of sufficient magnitude to satisfy <u>Tinker</u>.

### ii.  Foreseeable Risk of Future Substantial Disruption

Defendants also argue that their decision to discipline J.C. was based on a reasonable belief that the YouTube video was likely to cause a substantial disruption in the future.  In support, Defendants present the testimony of Lue-Sang, the administrative principal.  Lue-Sang testified that she believed classes would be disrupted by the video as a result of students "gossip[ing]" and "passing notes" in class instead of focusing on the lesson, and "children worr[ying] about whether or not something she had said had been videotaped and whether or not that would show up on line."  (Allen Supporting Decl., Exh. S [Lue-Sang Depo. at 99:13-21].)

There appears to be some factual support for Lue-Sang's prediction.  For example, although Lue-Sang did not state <u>why</u> she thought the vide would lead to gossip or passing notes during class, individual Defendant Hart testified that the YouTube video had 100 "hits" or "views" by the time she watched it on the morning of May 28, 2008.  (Allen Supporting Decl., Exh. N [Hart Depo. at 29:5-20].)  Hart also testified that C.C. told her that C.C. had been contacted by other students about the video, and that Hart believed, based on this conversation, that about half the eighth grade class had seen the video.  <u>Id.</u>  Thus, there is some evidence that Hart believed a

45

sufficient number of students had already seen the video, and in turn,
likely would discuss it.  It is not clear, however, if Hart relayed
this information to Lue-Sang.  That said, given Hart and Lue-Sang's
joint involvement in the investigation, and construing all reasonable
inferences in favor of Defendants, the Court can reasonably infer that
Hart shared this information with Lue-Sang.

Nonetheless, even assuming that Lue-Sang's prediction is
reasonable and is supported by sufficient evidence, the fear that
students would "gossip" or "pass notes" in class simply does rise to
the level of a substantial disruption.  As noted above, several cases,
including Tinker, have found that a general "buzz" about a student's
speech fails to meet the substantial disruption test.  Tinker, 393 U.S.
at 514, Bethlehem Area Sch. Dist., 807 A.2d at 868; Blue Mountain Sch.
Dist., 2008 WL 4279517, at *7.  Moreover, the speech must create
something more than a "mild distraction or curiosity" in order to past
muster under Tinker.  Thus, the School's fear that thirteen-year-old
students might pass notes in class and worry about their reputation
while in school cannot support the School's decision to discipline J.C.

Lue-Sang also testified that she feared that the video would lead
to students taking sides and possible violence among classmates.  (Def.
Statement of Genuine Issues, Additional Controverted Fact ["Def. ACF"]
14; Allen Opp'n Decl., Exh. Q [Lue-Sang Depo. at 102:6-14].)  Lue-Sang
based this belief on: "Past experience.  I base that on human nature.
I base that on children who are not that mature, they have to take a
breath and take a step back and think things through."  (Id.)  Further,
Defendants argue that there was "a possibility that C.C. had no clique
and, therefore, felt she was being ganged up on by the posting of the

video and the dissemination of that fact to other students." (Opp'n at 10.)

The Court finds that Lue-Sang's concern is too attenuated from the facts, and appears to be based largely on speculation. Here, for example, Lue-Sang admitted that none of the students involved in the YouTube video had a history of violence. (Allen Opp'n Decl., Exh. Q [Lue-Sang Depo. at 102:6-14].) There is also no evidence regarding the prior relationship between C.C. and the other students involved in the making of the video that would support a prediction that a verbal or physical confrontation was likely to occur. Had Defendants established that, for example, C.C. and R.S. had engaged in a verbal dispute during class over similar comments in the past, or that J.C. and C.C. often were disciplined for arguing with each other during school, that would certainly be relevant to the analysis. No such evidence exists here. Also absent from the record is any evidence of C.C.'s social history; certainly there is no basis upon which the fact-finder could conclude that "C.C. had no clique," as Defendants' surmise.

Even in the absence of specific evidence about these particular students, Defendants could have supported their fear of a future substantial disruption with evidence that student speech similar to the YouTube video had resulted in violence or near violence at Beverly Vista in the past.[12] See e.g., West v. Derby Unified, 206 F.3d 1358 (images of the confederate flag and other racially-charged symbols had

---

[12] The Court recognizes that the School need not prove that violence was likely to result from the YouTube video. There may be other types of disruption caused by a student's speech that exceed the mere "buzz" around campus, but fall short of violence. See e.g., Doninger, 527 F.3d 41 (substantial disruption found where school officials had to respond to complaints, and students were "all riled-up" and threatened a sit-in). However, the Court has limited its discussion to the reasons proffered by Defendants for having believed a substantial disruption would occur – i.e., that the video would lead to gossip and distractions (buzz) or that it might lead to violence. For the reasons explained above, both these arguments fail.

caused verbal and physical confrontations among students in the past).
However, the record is silent in this regard as well.[13]

A comparison of this case to the record LaVine helps illustrate the Defendants' evidentiary shortcomings.  In LaVine, the student, James, wrote a violent, gruesome and graphically-described poem about killing himself and shooting a large number of his classmates at school.  Not only were the contents of the speech clearly disturbing, to say the least, the school also knew that James had a documented history of suicidal ideations, a lengthy school discipline record (including an act of violence), problems at home (including domestic violence with his father), and had been accused of stalking his ex-girlfriend.  Further, the school was aware of several other recent mass school shootings in other schools that were similar to those described in James' poem.  Although the Ninth Circuit upheld the school's decision to expel James, the court expressly held that "this is a close case in retrospect." 257 F.2d at 983.

Clearly, the record here falls far short of the evidence supporting the school's decision in LaVine.  Here, without any evidence

---

[13] The Court notes that there is some evidence that J.C. had a history of videotaping while at school.  (Def.'s ACF 14.)  She had been suspended earlier that same year for videotaping a teacher, and had posted another video on YouTube of her friends talking at school.  (DSUF 41, 43.)  However, these facts are not relevant to the substantial disruption analysis.  J.C.'s prior discipline was not based on speech or expression.  Instead, J.C. had been disciplined for violating a school rule that prohibited students from videotaping others while in class.  (Declaration of Erik Warren in Support of Def.'s Mot. For Summary Judgment ¶ 10 and Exh. A, pg. 9, ¶ 14; Allen Supporting Decl., Exh. EE [J.C. Depo. at 23:4-19.]  Thus, J.C. was disciplined for conduct, not speech.  J.C.'s prior suspension does not implicate the First Amendment.

Further, to the extent that the Defendants argue that J.C. was suspended not only for the YouTube video, but also on the basis of her prior acts, this argument fails.  Having concluded that J.C.'s YouTube video did not cause, or was not reasonably likely to cause, a substantial disruption under Tinker, the school had no right to regulate such speech.  Thus, the YouTube should not have formed any basis for the suspension, regardless of whether J.C. had a prior disciplinary record.

of a history of disruptive verbal or physical altercations between the
students involved in the video, or of similar student speech causing
any type of disruption to school activity in the past, no reasonable
fact finder could conclude that the YouTube video was reasonably likely
to cause the type of future substantial disruption recognized in
<u>LaVine</u>.

Defendants, however, implore the Court to consider the age of the
children involved in this dispute.  Defendants repeatedly stress that
C.C. and her classmates were only 13 years old, and that their
emotional maturity is clearly limited.  Defendants contend that it is
not unusual for thirteen-year-olds to "form cliques, nor for
disagreements between such cliques to erupt in violence."  (Opp'n at
10.)  Thus, the School contends that it should be accorded some
deference to decide how best to protect the emotional well-being of its
young students.  The Court in large part agrees.  Indeed, no one could
seriously challenge that thirteen-year-olds often say mean-spirited
things about one another, or that a teenager likely will weather a
verbal attack less ably than an adult.  The Court accepts that C.C. was
upset, even hysterical, about the YouTube video, and that the School's
only goal was to console C.C. and to resolve the situation as quickly
as possible.

Unfortunately for the School, good intentions do not suffice here.
Defendants have failed to present sufficient evidence that the YouTube
video caused a substantial disruption to school activity on May 28,
2008.  Further, Defendants' fear that a substantial disruption was
likely to occur simply is not supported by the facts.  The Court cannot
uphold school discipline of student speech simply because young persons

are unpredictable or immature, or because, in general, teenagers are emotionally fragile and may often fight over hurtful comments.  To create a genuine issue for trial, Defendants must tie those conclusions to the situation presented to them on May 28, 2008. On this record, they have failed to do so.

In sum, the Court finds that, based on the undisputed facts, Plaintiff is entitled to judgment as a matter of law on her First Amendment claims.  Plaintiff's motion for summary judgment as to the First and Second causes of action is therefore GRANTED.

### 3.    Speech that Impinges On the Rights of Others

Before moving on to address the defense of qualified immunity, the Court will briefly address one additional school speech argument that appears to be raised by Defendants here.  In addition to the substantial disruption test, Tinker held that a school may regulate student speech that interferes with the "the school's work or [collides] with the rights of other students to be secure and be let alone."  393 U.S. at 508.  Thus, it appears that speech that "impinge[s] upon the rights of other students" may be prohibited even if a substantial disruption to school activities is not reasonably foreseeable.  Id. at 509.  That said, the precise scope of Tinker's "interference with the rights of others" language is unclear, as the Court's analysis in Tinker focused primarily on whether a substantial disruption was reasonably foreseeable.  Moreover, lower courts have not often applied the "rights of others" prong from Tinker.

Defendants rely, in part, on Ninth Circuit case interpreting the Tinker rights of others prong, Harper v. Poway Unified School District. (Mot. at 10-11.)  In Harper, the Ninth Circuit held that a student's

decision to wear a T-shirt with a religious message condemning homosexuality during the school's "Day of Silence" impinged upon the rights of other students under <u>Tinker</u>. 445 F.3d 1166 (9th Cir. 2006).[14] The Day of Silence was intended to "teach tolerance of others, particularly those of a different sexual orientation." <u>Id.</u> at 1172 (internal citations to the record omitted). On that day (and the day after), student Tyler Harper came to school wearing a T-shirt on which the words "Homosexuality is Shameful" were handwritten. <u>Id.</u> Harper was sent to the administrative offices and was not permitted to return to class for the rest of the day. <u>Id.</u> at 1172-73. Shortly thereafter, Harper brought suit against the School District, alleging (among other things) a violation of his First Amendment rights. <u>Id.</u> at 1173.

The district court denied Harper's request for a preliminary injunction, and the Ninth Circuit affirmed. Analyzing the case under the rights of others prong from <u>Tinker</u>, the Ninth Circuit found that the speech constituted a "verbal assault [to public school students] on the basis of a core identifying characteristic such as race, religion, or sexual orientation." <u>Id.</u> at 1178. The court found that: "It is simply not a novel [or disputed] concept, however, that such attacks on minority students can be harmful to their self-esteem and to their ability to learn." <u>Id.</u> at 1180. Thus, the court held that student speech that attacks "particularly vulnerable" students on the grounds of "a core characteristic" - namely, race, religion, and sexual orientation - impinged on the rights of others and could be regulated

---

[14] This decision was vacated as moot by <u>Harper v. Poway Unified Sch. Dist.</u>, 549 U.S. 1262 (2007). By the time the case reached the Supreme Court on certiorari, the district court had entered final judgment dismissing plaintiff's claims for injunctive relief as moot. The Court vacated the prior judgment denying the preliminary injunction "to clear the path for future relitigation of the issues between the parties and to eliminate a judgment, review of which was prevented by happenstance." <u>Id.</u> at *1.

1    under <u>Tinker</u>.  <u>Id.</u> at 1183.  The court, however, expressly limited its

2    holding to speech attacking students on those three grounds, and even

3    declined to extend its holding to remarks based on gender.[15]

4        Defendants argue that <u>Harper</u> demonstrates that "California schools

5    have an obligation to protect students from psychological assaults that

6    cause them to question their self worth."  (Mot. at 11.)  This is

7    undoubtedly true; however, California schools cannot exercise this

8    obligation in a manner that infringes upon other student's First

9    Amendment rights.  The task for this Court is not to assess whether the

10   School's intentions were noble; no one could dispute that the School

11   was attempting to protect C.C. from psychological harm.  That said, the

12   Court is not aware of any authority, including <u>Harper</u>, that extends the

13   <u>Tinker</u> rights of others prong so far as to hold that a school may

14   regulate any speech that may cause some emotional harm to a student.

15   This Court declines to be the first.

16       In sum, the Court finds that the rights of others test from <u>Tinker</u>

17   is not applicable to the present case.

18       For the reasons stated, Plaintiff's Motion for Summary

19   Adjudication on the First and Second causes of action for violation of

20   the First Amendment under § 1983 is GRANTED.

21

22

---

23   [15] <u>Harper</u> has not often been cited by other courts for the proposition that
     speech attacking students on the basis of race, religion or sexual orientation
     may be regulated under the "rights of others" standard in <u>Tinker</u>.  Further,

24   those cases that do cite to <u>Harper</u> decline to extend its holding to other
     types of speech.  <u>See</u>, <u>e.g.</u>, <u>Bowler v. Town of Hudson</u>, 514 F. Supp. 2d 168 (D.

25   Mass. 2007) (discussed above) (distinguishing students' posters that included
     a reference to a website with links to violent content from "derogatory or
     injurious remarks directed at student's minority status," and rejecting

26   defendants' argument that <u>Harper</u> applied); <u>Zamecnik v. Indian Prairie Sch.</u>
     <u>Dist. No. 204 Board of Education,</u> 619 F. Supp. 2d. 517, 523 (N.D. Ill 2007)

27   (citing <u>Harper</u> for the proposition that "derogatory and statements about
     homosexuality tend to harm homosexual high school students by lowering their

28   self esteem").

**C.   Qualified Immunity**

The individual Defendants, Erik Warren, Cherryne Lue-Sang, and Janice Hart, seek summary adjudication as to Plaintiff's First Cause of Action, on the ground that they are entitled to qualified immunity. For the reasons stated below, the individual Defendants' motion is GRANTED.

The doctrine of qualified immunity shields public officials sued in their individual capacity from monetary damages, unless their conduct is violates "clearly established" law of which a reasonable public officer would have known.  <u>Saucier v. Katz</u>, 533 U.S. 194, 199 (2001); <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987) (officials should be shielded from damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated").  The defense "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." <u>Hunter v. Bryant</u>, 502 U.S. 224 (1991).

The court must make a two-step inquiry in deciding the issue of qualified immunity. <u>Saucier</u>, 533 U.S. at 200.  First, the court must determine whether, under the facts alleged, taken in the light most favorable to the plaintiff, a violation of a constitutional right occurred.  <u>Id.</u>  If so, the court must then ask whether the constitutional right was clearly established at the time of the violation.  <u>Id.</u>  "A right is 'clearly established' for purposes of qualified immunity when its contours are sufficiently clear that reasonable officials would know that their actions violated that right." <u>Layshock v. Hermitage Sch. Dist.</u>, 496 F. Supp. 2d 587, 603 (W.D. Pa. 2007); <u>Trevino v. Gates</u>, 99 F.3d 911, 917 (9th Cir. 1996).

Initially, the Supreme Court in <u>Saucier</u> held that these two inquiries must be decided in rigid order.  <u>Saucier</u>, 533 U.S. at 200. That is, a district court had to resolve whether a violation of a constitutional right occurred before it could evaluate whether the right was clearly established.  Recognizing, however, that "there are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," the Supreme Court recently relaxed the order of analysis.  In <u>Pearson v. Callahan</u>, the Court held that the <u>Saucier</u> analysis may be addressed in either order if the second step is clearly dispositive and can address the matter efficiently.  129 S. Ct. 808, 821 (2009).

Here, although the Court has found that a violation of J.C.'s First Amendment rights has occured, the second <u>Saucier</u> step unequivocally resolves the issue of qualified immunity in Defendants' favor.

Plaintiff has the burden of proving that the right allegedly violated was clearly established at the time of the defendant's conduct.  <u>Trevino v. Gates</u>, 99 F.3d 911, 916-17 (9th Cir. 1996).  To determine whether a law is clearly established, the court "survey[s] the legal landscape" and examines those cases that are "most like" the present case.  <u>Id.</u> at 917 (quoting <u>Figueroa v. United States</u>, 7 F.3d 1405, 1409 (9th Cir. 1993).  In the Ninth Circuit, specific binding precedent is not required to show that a right is clearly established for purposes of the qualified immunity analysis.  <u>Maraziti v. First Int'l Bank of Calif.</u>, 953 F.2d 520, 525 (9th Cir. 1992) (quoting <u>Brady v. Gebbie</u>, 859 F.2d 1543, 1557 (9th Cir. 1988)).  In the absence of binding precedent, district courts should look to "all available decisional law including the decisions of state courts, other circuits, and district courts to determine whether the right was clearly established."  <u>Id.</u>  Where the specific factual scenario presented has not been previously litigated and decided, the court may nonetheless find clearly established law if "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question."  <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997).

Here, there is no binding Supreme Court precedent that governs J.C.'s conduct.  The Supreme Court has yet to address whether off-campus speech posted on the Internet, which subsequently makes its way to campus either by the speaker or by any other means, may be regulated by school officials.  Tinker only addressed student speech originating on campus.  Further, each of the three Supreme Court cases decided after Tinker carved out specific enclaves in which student speech is subject to discipline - i.e., lewd speech, speech bearing the imprimatur of the school, or speech taking place at a school-sponsored event and relating to illegal drug use.  None of those factual settings are present here.

Plaintiff nonetheless argues that "there is a long line of precedents stretching back almost 40 years which provides geographical limitations on a school's power to punish students for what they say, making this an obvious case of school officials violating a student's First Amendment rights."  (Opp'n at 2.) (emphasis added).  This argument clearly misinterprets the existing law.  As discussed in detail above, a number of district and circuit courts, including the Ninth Circuit, have applied Tinker directly to speech that somehow makes its way to campus, regardless of where the speech originated, and regardless of whether the speaker himself or someone else was responsible for bringing it to campus.  Further, the only Ninth Circuit authority the Court is aware of which addressed speech that originated off-campus, without any connection to a school project and without the use of school resources, **upheld the School's regulation of the speech**.  LaVine v. Blaine School District, 257 F.3d 981 (9th Cir. 2001).  As far back as 30 years ago, a distinguished panel of the Second Circuit recognized that "territoriality is not necessarily a useful concept in determining the limit of [the school's authority to discipline]," Thomas v. Bd. of Educ., 607 F.2d 1043, 1058 n.13 (Newman, J., concurring), and that students can "incite substantial disruption within the school from some remote locale."  Id. at 1052 n.17 (Kaufman, J., majority).

The one district court case cited by Plaintiff, Emmett v. Kent Sch. Dist. No. 415, does not provide otherwise.  92 F. Supp. 2d 1088 (2000).  First, contrary to Plaintiff's contention, Emmett **did not hold**

that "speech on the Internet, having nothing to do with school and not accessed at school, cannot be regulated." (Opp'n at 11.)  In fact, Emmett did not decide the issue at all, merely holding that plaintiff had shown a sufficient likelihood of success on his First Amendment claim to support a preliminary injunction.  Id. at 1090.  Further, the Emmett court expressly based its holding on the application of Tinker – thereby implicitly accepting that speech created off campus and posted on the Internet *could be* regulated provided that the substantial disruption test was met.  Id.[16]  Plaintiff has not cited, and the Court has not found, any case holding that a student's speech that actually caused a substantial disruption on campus, or was reasonably likely to do so, was outside of the realm of school discipline simply because it originated off campus.

Additionally, while numerous recent cases have applied the Supreme Court's student speech precedents to cases involving student speech over the Internet, see Beussink, Emmett, Killion, O.Z., Wisniewski, Doninger, and Bethlehem, none have done so in a factually analogous setting.  The Court has yet to find a student-speech case addressing hurtful and embarrassing speech directed at a student's classmate, which emanated outside the school grounds.

Less than a year before J.C. created the YouTube video, the Supreme Court in Morse pointedly recognized the "uncertainty as to the boundaries of the school speech precedents" and the "necessity for school administrators to react decisively to unexpected events." Layshock, 496 F. Supp. 2d at 604 (citing Morse, 551 U.S. 393).  While the five separate opinions in Morse aptly illustrate the "plethora of approaches that may be taken in this murky area of the law," (id.), the Justices were unanimous in at least one respect – all agreed that the principal was entitled to qualified immunity.  Morse, 551 U.S. at 409.  The same conclusion is obvious here.  Certainly, the contours of a student's First Amendment right to make a potentially defamatory and degrading video about a classmate, which is almost immediately

---

[16] In Emmett, the student's website never made it to campus at all, and there was no evidence that any student brought it to the School's attention or that any disturbance whatsoever had occured; rather, the School became aware of the website merely because it had been featured on the local news. 92 F. Supp. 2d. at 1089-90. Thus, no substantial disruption could be established on these facts. See id. at 1090.

thereafter brought to the School's attention, are not clearly established.

In sum, Hart, Lue-Sang, and Warren are clearly entitled to qualified immunity in this case.

**IV.    CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Adjudication as to her First and Second causes of action for violation of section 1983 is GRANTED.

The individual Defendants, Hart, Lue-Sang, and Warren's Motion for Summary Adjudication on the issue of qualified immunity as to the First Cause of Action is GRANTED.

An order regarding Plaintiff's Motion for Summary Adjudication as to the due process claim will follow shortly.

            IT IS SO ORDERED.

DATED: November 16, 2009                    _____
                                                    STEPHEN V. WILSON
                                            UNITED STATES DISTRICT JUDGE